IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
HOT SPRINGS DIVISION


J.S. HAREN COMPANY                                              PLAINTIFF

V.                              NO. 6:17-CV-06083

FAIRFIELD SERVICE COMPANY OF INDIANA, LLC                       DEFENDANT


## FINDINGS OF FACT AND CONCLUSIONS OF LAW

Plaintiff J.S. Haren Company filed this action for damages against Defendant Fairfield Service Company of Indiana, LLC alleging claims for breach of contract, breach of express and implied warranties, and revocation of acceptance arising from the sale and purchase of equipment to be used in the upgrade of the Stokes Pump Station in Hot Springs, Arkansas. Defendant denies the claims and contends the equipment it furnished materially complied with Plaintiff's specifications and was fit for the intended purpose or, in the alternative, that Plaintiff failed to timely reject the equipment, acted unreasonably, and failed in its duty to mitigate its own damages. The Court held a bench trial beginning the morning of June 17, 2019 in Hot Springs, Arkansas. Plaintiff appeared by and through its authorized representative, J.S. "Sky" Haren, and was represented by its attorney of record, James D. Lawson, P.C. Defendant appeared by and through its authorized representative, Madu Murarka, and was represented by counsel, Travis J. Morrissey of the Morrissey Law Firm.

At trial, the Court admitted Plaintiff's Exhibits 1 through 41 (Exhibit and Witness List, June 18, 2019, ECF No. 37) and Defendant's Exhibits 1 through 3. *Id.* The Court heard testimony from Sky Haren, Larry Merriman, Chris Buntin, David Poston, and Madu Murarka. (Witness List, June 18, 2019, ECF No. 36.) Now having reviewed the record, witness testimony, and the evidence

1

presented, the Court issues the following findings of fact and conclusions of law pursuant to Rule 52(a) of the Federal Rules of Civil Procedure. For the reasons explained below, the Court finds that Plaintiff is entitled to judgment in the amount of $180,000, with each party to bear its own costs.

## I.       FINDINGS OF FACT

1. Plaintiff, J.S. Haren Company, is a Tennessee corporation with its principal place of business in Athens, Tennessee. Sky Haren is Plaintiff's authorized representative.

2. Defendant, Fairfield Service Company of Indiana, LLC is a limited liability company with its principal place of business located in Michigan City, Indiana. Madu Murarka is company President and Defendant's authorized representative.

3. The Stokes Pump Station Upgrades project is owned by the City of Hot Springs, Arkansas (the City). The project was designed to improve the City's wastewater treatment capability. Larry Merriman was the City's Project Manager.

4. Garver, LLC, is an engineering firm located in Fayetteville, Arkansas, hired by the City to act as its representative in connection with the Project. Garver also designed the Project, including all plans, contract documents and specifications. Chris Buntin, licensed professional engineer, acted as the Project Manager for Garver. T.J. Bruck acted as Garver's local Project construction observer.

5. As part of the bidding process, Contractor was required to complete a Bid Form complying with "the prescribed requirements, and such alternates, unit prices, and other data" as provided in the City's Bidding Documents. (Specs. and Contract Docs., Pl's. Ex. 1, volumes 1 and 2, Dec. 15, 2015.) The Bidding Documents are very precise and detailed and include Bidding

Requirements, Contract Documents, Conditions, General Requirements, and Technical Specifications. *Id.*

6. Among the items of equipment specified for completion of the Project were a Mechanical Bar Screen and a Washer Compactor (the Equipment). (*Id.* at vol. 2, section 44 42 27.19.) The Bidding Documents specified that the Equipment must be the end product of one responsible manufacturer and that the Contractor would be responsible for providing the Equipment as specified in the Bidding Documents. *Id.* The Bidding Documents designated two responsible manufacturers, including Fairfield and another named Duperon. *Id.*

7. Contractor sought out bids from suppliers for the Equipment in order to prepare its bid for the Project. On December 18, 2015, Fairfield submitted its proposal to supply the Equipment as specified in the Bidding Documents at a cost of $173,000. Mark Hickok of BT Environmental acted as sales representative for Fairfield.

8. The Duperon proposal came in at $180,000.

9. At trial, Sky Haren testified that the Contractor chose to purchase the Equipment from Fairfield based on its lower price and past manufacturing experience.

10. On January 21, 2016 the City notified Contractor that it was the successful bidder for the Project. The City awarded the Project to the Contractor after determining it was the lowest responsible and responsive bidder. The total contract price of the Project was $2,317,000.00 (two million, three hundred seventeen thousand dollars). (*Id.* at vol.1, section 00 51 00.)

11. The contract between the City and Contractor specified that time was of the essence regarding the timeline for achieving Substantial Completion (320 calendar days) and completion and readiness for final payment (365 calendar days). The contract provided for liquidated and special damages in the event of Contractor's failure to meet the Project timeline. The Project timeline began to run on March 1, 2016. (*Id.* at 00 52 00.)

12. The contract is to be governed by the law of the State of Arkansas (the state in which the Project is located.)  *Id.* at 00 72 00, Art. 18.07.

13. On January 28, 2016, Contractor transmitted to Fairfield a written Material Order in the amount of $173,000 for purchase of the Equipment, and Fairfield accepted the order.  (Material Order No. 4502, Feb. 9, 2016, Pl.'s Ex. 2.)  Payment terms were 90 percent within 30 days and the balance due within 120 days after startup.  *Id.*

14. The terms of the Material Order specified the Equipment would be manufactured in accordance with "Plans and Specifications including General Conditions for the Stokes Pump Station for the City of Hot Springs, AR dated November 25, 2015, and Addendum No. 1, dated December 15, 2015, as prepared by Garver USA, Fayetteville, AR..." *Id.*

15. The Material Order stated that Fairfield would be liable for any liquidated damages caused by its failure to meet the time schedule, but that liquidated damages would "only be charged if the contractor is accessed [sic] damages which are directly attributable to Fairfield's performance or lack thereof."  *Id.*

16. The Material Order does not include a provision for attorney's fees.

17. The Material Order bound Fairfield to provide submittal data to Garver for approval prior to March 16, 2015 and to provide the Equipment within 140 calendar days after approval.  *Id.*

18. Fairfield's submittal data was provided to Garver on March 7, 2015.

19. In support of its submittal data, Fairfield provided a Special Warranty Letter for the Equipment dated May 25, 2016.  (Pl.'s Ex. 4.)

20. Garver approved Fairfield's submittal data in or around May or June 2016.

21. On or around October 28, 2016, Fairfield delivered the Equipment to the Project site and invoiced Contractor the sum of $155,700.00 (90 percent of the agreed price).

22. Due to unforeseen circumstances involving another vendor, the Project was running behind schedule, and Contractor accepted delivery of the Equipment and stored it outdoors on the Project site for installation at a later date.

23. Upon receipt of the Equipment, Contractor performed a cursory inspection that revealed a bent door. Contractor notified Fairfield of the damage, and Fairfield replaced the door.

24. Sky Haren testified that, because the Equipment was intended for outdoor use in a wastewater facility, Contractor thought that storing the Equipment outdoors would not cause it to suffer damage. The cursory inspection made upon receipt of the Equipment was thought to be enough, because there was no reason to question whether Fairfield had manufactured the Equipment in accordance with the Project plans and specifications and the approved submittal data.

25. Sky Haren is a credible and believable witness, and the Court accepts his testimony as truthful and accurate.

26. On July 6, 2017 a progress meeting was held between the City (Merriman), Garver (Buntin) and Contractor (Sky Haren), and it was agreed the installation of the Equipment would be scheduled for the end of June 2017. This date was later postponed to a time between July 10 and 14, 2017, and a Substantial Completion inspection was scheduled for August 8, 2017.

27. On July 11, 2017, T.J. Bruck, Garver's construction observer, visited the Project site and noted visible corrosion on the mechanical bar screen component of the Equipment and sent photos to Chris Buntin, Garver's Project Manager.

28. Upon reviewing the photos, Buntin became concerned that the materials used to construct the bar screen were not stainless steel as specified and shown in Fairfield's submittal. Buntin emailed Haren inquiring about the material used for the Fairfield screen link system. (Pl.'s Ex. 8, Buntin message, Tue., July 11, 2017 12:51 PM.)

29. After looking at the photos, Merriman emailed Buntin and Haren and requested confirmation that the materials used to manufacture the Equipment were as specified in the Bidding Documents prior to installation. "No one will want to remove it to validate or change any components…" (Pl.'s Ex. 8, Merriman message, Tue., July 11, 2017 4:15 PM.)

30. Mark Hickok of BT Environmental, acting on behalf of Fairfield, emailed Haren to confirm that the "bar screen links are made out of 304SS as specified" and that "the screen & compactor are both supplied as submitted & approved[.]" (Pl.'s Ex. 9, Hickok message, Tue., July 11, 2017 5:28 PM.) Haren forwarded Hickok's email to Buntin and Merriman.

31. Merriman emailed Haren, Buntin, and Hickok, "Based on the field observation of the snap rings, I would have to challenge that they are S/S. However, my eyes do not qualify as a spectrometer so I will rely on those who have material info to respond. As I first said, if we install it and it is incorrect changing any component will surely be more difficult." (Pl.'s Ex. 9, Merriman message, Wed. July 12, 2017 7:55 AM.)

32. On July 12, 2017 there was an on-site inspection of the Equipment performed by Hickok performed as Fairfield's local representative. Hickok noted the lock-links, adjustable roller arm pins, scrapper arm mounting bolts, and the lock-link pin snap-rings were specified to be made of 304SS (stainless steel), and Fairfield's approved submittal data specified the parts were to be made of 316SS. It was noted some of the parts appeared to be rusting. (Pl.'s Ex. 5.) Additionally, it was noted that the screen doors were mounted with SS bolts, when the specifications called for Knurled Knobs and the submittal data specified SS Wing Nuts/Thumb Nuts. *Id.* It was also noted that the Gear Drive Box Motor supplied was a Marathon Motor and not the Baldor Motor submitted and approved. *Id.*

33. After completing the inspection, Hickok emailed Merriman, Buntin and Haren to say, "[Fairfield] will address the items called out [and] supply verification of materials of

6

construction as requested.  The snap-rings on the lock-link pins are rolled steel, this was an oversite [sic] and these will be replaced with SS snap-rings as required." (Pl.'s Ex. 9, Hickok message, Wed. July 12, 2017 2:04 PM.)

34. By letter addressed to Contractor dated July 13, 2017, Fairfield addressed the Equipment irregularities noted by Hickok during the inspection.  (Pl.'s Ex. 5.)  Fairfield promised to test the lock-link material and submit a test report.   Fairfield admitted some fasteners on both the adjustable roller arm and the scrapper arm were not stainless steel and promised to provide new fasteners.  *Id*.  With respect to the lock-link pin snap rings, Fairfield admitted the snap rings were not stainless steel as specified by the Bidding documents or as submitted by Fairfield and approved by Garver.  Fairfield explained that "stainless steel Snap-Rings get loose after repeated application.  Hence, we have changed the material of the Snap-Rings [to] spring steel."  According to Fairfield, while spring steel is weak in corrosion resistance, it has better elastic resilience.  *Id*.  Fairfield admitted the screen doors were improperly mounted and promised the specified Knurled Knobs would be provided.  Finally, Fairfield addressed the issue with the Gear Box Drive Motor, stating that the alternate brand meeting the specifications and intended performance had been supplied in order to meet the project delivery schedule. *Id.*

35. By letter dated July 13, 2017, Buntin notified Contractor that the materials used to manufacture the mechanical bar screen were not stainless steel as specified and noted in the submittal data approved by Garver, and the materials did not meet the Project plans and specifications. Questionable items included the chain pin retaining ring material, chain links material, various bolts material, lynch pins material, and chain drive drum material.  In addition, Buntin noted knurled knobs had not been provided, several handles were missing from Equipment panels, the motor provided was a Marathon instead of the Baldor motor as specified, and the gear box

manufacturer was unknown because the tag had been removed. "Non-conforming items will not be allowed for this project. Please provide a corrective action plan and verification of questionable items for review." (Pl.'s Ex. 10, Buntin letter, July 13, 2017.)

36. On Monday, July 17, 2017, Buntin followed up with a second letter to Contractor advising that additional items had been discovered that did not meet the Project plans and specifications. "We also anticipate there may be other items not yet noted…Please consider this notice to document that the [mechanical] bar screen is defective. All items must be resolved, as approved by the Owner and [Garver], prior to acceptance of this equipment." (*Id.,* July 17, 2017 letter.) Buntin demanded a corrective action plan, insisting that the plan include an inspection of all Equipment components by a qualified Fairfield representative. Buntin also requested Fairfield's fabrication shop drawings and materials testing reports. *Id.*

37. Two days later, Buntin emailed Haren requesting an update on the mechanical bar screen and a schedule for all remaining work. "Resolution is needed as soon as possible to be substantially completed on August 8th…." (Pl.'s Ex. 10, Buntin message, Wed., July 19, 2017 7:54 pm).

38. The following Monday, Hickok emailed Haren and Buntin advising that, according to Fairfield, the bar screen links were made of 316 SS and appear to have oxidation deposits on them. Hickok asked whether a spectrometer test of the of the bar screen links would be acceptable to the City. Hickok also inquired as to whether the City wanted the links cleaned up or changed out. (Pl.'s Ex. 11, Hickok message, Mon. July 24, 2017 11:41 am.)

39. In response to Hickok's email, Buntin emailed Haren, "We will advise upon receiving a corrective action plan, and the corrective action plan is pending the previously requested items (Fairfield Inspection, Testing Reports, and Fabrication Shop Drawings) to confirm all items to be corrected. Please provide a schedule for correction of defective work and all other items remaining for substantial completion." (*Id.*, Buntin message, Mon., July 24, 2:04 pm.)

40. At trial, Madu Murarka testified that the stainless steel used to make the screen was certified by the manufacturer in India. Any rust observed on the screen formed on environmental contaminants deposited on the screen during the manufacturing process. The observed rust could have been sanded off at start-up of the Equipment.

41. Haren messaged Buntin acknowledging some confusion and advised that Fairfield thought a corrective action plan had been submitted in previous correspondence. "The question is in regards to the stainless steel chains. Providing these prove to be 316 stainless steel (316 SS), will Fairfield be able to continue with their use even though they are discolored…" *Id.* Haren explained the discoloration was most likely caused by the oxidation of residue deposits picked up during fabrication. "Being the unit will operate in wastewater and future coloration is most likely, it seems the coloration would not be an issue…" *Id.*, Haren message, Mon., July 24, 2017 3:05 PM.

42. Fairfield Project Manager Steve Schweinfurth emailed Haren to advise that the Equipment had been inspected by BT Environmental, Fairfield's local representative, "to confirm the questionable components and material." Fairfield's plan was to replace the steel components/defective material with stainless steel "as submitted [and] approved per Fairfield's response letter." (Pl.'s Ex. 11, Schweinfurth message, Mon., July 24, 2017 3:53 pm.) Schweinfurth questioned why Fairfield was required to resubmit the "shop/assembly drawings [that] were a part of the approved submittal…" Finally, Schweinfurth informed Haren that Fairfield "has complied in providing 316 SS material for the bar rack links and considers this a closed topic." *Id.*

43. Haren passed Schweinfurth's email on to Hickok and Buntin, explaining that the email provides "further clarification from Fairfield as regarding the screen. Fairfield will proceed

with the replacement…so that 304 stainless steel is used." *Id.*, Haren message, Mon., July 24, 2017 3:17 PM.

44. Hickok sent an email to Haren and Buntin confirming BT Environmental would be onsite the next morning "to remove and replace all of the non-stainless steel (snap-rings, bolts [and] nuts) so that [Contractor] can proceed with moving and setting it into place." (*Id.*, Hickok message, Mon., July 24, 2017 4:49 PM.)

45. Buntin fired back an email to Haren and Hickok, "I am confused. Confirmation of defective items is outstanding, and the corrective action has not been approved." Buntin pointed out deficiencies in Fairfield's proposed plan: the requested material testing reports had not been provided, and the inspection of all Equipment components was supposed to be performed by a qualified Fairfield representative, and the inspection by its sales representative, BT Environmental, was not acceptable. Furthermore, based upon an inspection of the Equipment by Garver and the City, there were other "non-conforming items remain[ing] to be identified, including but not limited to the welds…. Skip welds are not acceptable. The submittal did not include the fabrication design, welding details, welder certification, weld inspection reports. Please provide supplemental welding information. Will qualified representatives from Fairfield inspect all equipment as requested?" *Id.*, Buntin message, Mon., July 24, 2017 7:03 PM.

46. The next morning, Hickok emailed Schweinfurth to point out that "the original specification…does require that all welds below grade be seal-type welds, it also requires that a copy of welder certification and weld inspection reports be submitted prior to delivery to job site." Hickok stated that "repairing onsite is no longer an option, the screen should be picked up to be returned to your fabricator." (Pl.'s Ex. 11, Hickok message, Tue., July 25, 2017 10:26 AM). Hickok admonished Schweinfurth and Fairfield that all issues must be addressed and

"all of this need[s] to happen with a 1-week period as the cut-off for completion is August 8th." *Id.*

47. Shortly thereafter in an email to Hickok and Haren, Schweinfurth addressed the skip weld issue, "[I]f the stiffeners are the concern, these can be stitch welded and do not need to be fully seal welded, though it might call out in the specs. I was hoping the consulting engineer can understand this and further explain to us the reasons for full seal welds, as the function is not affected by this in the application. All of our existing equipment of this type has the skip welds or stitch welds as indicate here." *Id.*, Schweinfurth message, Tue., July 25, 2017 11:39 am.

48. After hearing nothing else for two days, Sky Haren sent an email to Schweinfurth writing, "Because the equipment supplied is not in conformance with the specifications, we must demand a complete refund of the monies paid to date." *Id.*, Haren message, Thu., July 27, 10:55 AM. "If we cannot receive an acceptable plan to correct the deficiencies by 5:00 PM this evening (today), we will provide termination notice to Fairfield and proceed to purchase this equipment from other sources, all with the intent of recovering all cost associated with Fairfield's failure to perform." *Id.*

49. A few hours later, Schweinfurth emailed a Corrective Action Proposal to Contractor and Hickok. Schweinfurth represented that Fairfield intended to "correct any issues within a period timely to the placement and startup of the unit." (Pl.'s Ex. 11, Schweinfurth message, Thu., July 27, 2017 1:42 AM.) The terms of the proposal included the removal of rolled steel snap-rings and replacement with stainless steel; seam-welds would be made on the frame and gussets below the mounting feet as required; and all welds would be properly cleaned and polished as required. (*Id.*, Fairfield letter, July 27, 2017.)

50. Contractor forwarded Fairfield's proposal to Buntin and Merriman asking for approval. *Id.*, Haren message, Thu., July 27, 2017 1:04 PM.

51. The next afternoon Schweinfurth emailed Haren and Hickok to advise against the use of stainless-steel retaining rings. "The reason we use spring steel is to make sure that the [ring] is tight on the pin and has memory to go back to its original shape." (Pl.'s Ex. 12, Schweinfurth message, Fri., July 28, 2017 1:23 PM.) Schweinfurth requested confirmation that Haren understood the recommendation against the use of stainless-steel snap-rings. Schweinfurth repeated his request in a second email a short time later. *Id.* at 3:10 PM. Haren forwarded the Schweinfurth requests to Buntin.

52. Buntin emailed Merriman, Haren and Fairfield to point out deficiencies with Fairfield's Corrective Action Proposal: no material testing reports were included; the fabrication drawings had not been provided; no welder certifications for previous work had been provided; no welder certifications for welders proposed to perform the corrective work had been provided; and the Proposal did not include a specific explanation of the corrective action to be taken regarding the welds. Buntin wanted to know what would be welded and how. Finally, Buntin pointed out that no inspection of the Equipment had been performed by a qualified Fairfield representative. (Pl.'s Ex. 12, Buntin's message, Fri., July 28, 2017 1:38 PM.)

53. Haren emailed Buntin advising that the screen equipment had been removed from the site for repair by Fairfield. "The burden is on Fairfield to make the necessary corrections to be in compliance with [the] original submittal." Upon return of the repaired screen equipment, Garver and the City would have an opportunity to inspect the screen for deficiencies. Haren also explained that the screen would be returned in compliance with the original, approved submittal[1] and the materials would be 304 stainless. Haren objected to the necessity of having to submit a sealed design of the shop fabrication drawings [showing the welds], as the

---

[1] The Bidding Document specifications allowed 304 stainless, and Fairfield's approved submittal specified 316 stainless steel. Fairfield intended to use the 304 stainless to make repairs. Fairfield promised another submittal clarify this detail if required by the City.

information would take weeks to obtain.  (Pl.'s Ex. 13, Haren message, Fri., July 28, 2017 4:29 PM.)

54. Buntin messaged Haren back to make clear that the correction of defective work is Contractor's responsibility and substitution requests are required for any deviation from the submittals. Furthermore, Contractor would be held responsible for the cost of any testing that confirms defective work.  Finally, Buntin advised that payment would not be made for undelivered materials.  Defective work would be subject to a reduction in payment.  (Pl.'s Ex. 13, Buntin message, Mon., July 31, 2:17 pm.)

55. Haren replied that he was "pressing Fairfield in regards to the corrections and encouraging them to compare the end product with the specifications and their approved submittal prior to the screen's return to the site."  Haren projected a Substantial Completion date of August 18, 2017.  (Pl.'s Ex. 13, Haren message, Mon., July 31, 2017 2:28 PM.

56. Buntin confirmed that Garver and the City wished to inspect the repaired screen equipment, and asked Haren to "accommodate the special inspection as specified and provide notice of access."  Buntin reminded Haren that the fabrication drawings should be made available for review during the inspection.  *Id.*, Buntin message, Mon., July 31, 2017.

57. Haren wrote back requesting seeking the specific section of the Bidding Documents that could be reviewed for compliance regarding "Special Inspections."  *Id.*, Haren message, Mon., July 31, 2017 3:34 PM.

58. Buntin referred Haren to Article 14 of the General Conditions and Section 10 45 24 Special Tests and Inspections.  *Id.*, Buntin message, Mon., July 31, 2017 4:44 PM.

59. The next day, Hickok emailed Buntin on behalf of Fairfield and requested a teleconference. (Pl.'s Ex. 14, Hickock message, Tue., Aug. 1, 2017 10:56 AM.)

60. Buntin responded that if the City and Contractor would also be available, Buntin could participate in a teleconference after 3:00 pm. *Id.*, Buntin message, Tue., Aug. 1, 2017 12:23 PM.

61. A telephone conference between VK Murarka and Schweinfurth of Fairfield, Hickok, Merriman, Buntin, and Haren was held at 3:00 pm on Tuesday, August 1, 2017.

62. A few days later, Haren emailed Schweinfurth asking for a status update on the screen repairs and reminded Fairfield of the necessity for welding certifications and a list of specific repairs. (Pl.'s Ex. 14, Haren message, Thur., Aug. 3, 2017 3:31 PM.)

63. Friday morning Merriman messaged Haren and Schweinfurth asking to be informed of the latest status of the screen repairs. (Pl.'s Ex. 14, Merriman message, Fri., Aug. 4, 2017 9:48 AM.)

64. Friday afternoon, Buntin sent a letter to Haren. (Pl.'s Ex. 14, Buntin message, Fri., Aug. 4, 2017, 3:30 pm.)

65. Schweinfurth emailed Merriman, Haren, and Buntin and attached the welding certificates to the email. (Pl.'s Ex. 15, Schweinfurth message, Mon. Aug. 7, 2017 11:55 am.)

66. Haren messaged Schweinfurth and accepted the weld certificates. Haren asked Schweinfurth to provide the "schedule regarding the welding repairs as well as the other components to be changed." *Id.*, Haren message, Mon., Aug. 7, 2017 11:25 AM.

67. In response to the proffered welding certificates, Buntin messaged Haren: "We have reviewed the welding certificates… The welders are approved for flat position only (not approved for horizontal, vertical, overhead welds.) …Some welds are defective, and the approval of other welds, including corrective action, is contingent upon the fabrication drawings. For the last time, please provide the fabrication drawings." *Id.*, Buntin message, Mon., Aug. 7, 2017 5:01 pm.

68. Haren replied to Buntin asking for clarification of why the fabrication drawings were necessary for approval of the correction plan. Pl.'s Ex. 16, Haren message, Tue., Aug. 8, 2017 7:42 AM.

69. Haren emailed Schweinfurth for information on welding in the flat position and stated "Fairfield should be embarrassed to ship equipment with that type of welding. [The welds] may be structurally good but the workmanship is a disgrace." Haren demanded the fabrication drawings immediately. Pl.'s Ex. 17, Haren message, Tue., Aug. 8, 2017 8:41 AM.

70. Schweinfurth provided additional certified stainless-steel welding certificates and welder qualification records for approval. Schweinfurth noted, "The general request for fabrication drawings needs to be specific in nature as this is proprietary information and may be handled in a different method/manner. Please advise so we may better address the request. (Pl.'s Ex. 16, Schweinfurth message, Tue., Aug. 8, 2017 10:04 am.)

71. Haren passed the additional welder certificates and qualifications along to Buntin and Merriman and wrote, "Also, because fabrication drawings include proprietary information, it is necessary to understand the information the engineer wishes to know and this information may be able to be provided in a different method. (Pl.'s Ex. 20, Haren message, Tue., Aug. 8, 2017 9:58 AM.)

72. In response, Buntin messaged Haren to let him know that Garver and the City were satisfied with the revised welding certificates. Buntin explained that the fabrication drawings were needed to "confirm the equipment is as per the intended design." *Id.*, Buntin message, Tue., Aug. 8, 2017 7:20 pm. "We are concerned the vendor is so reluctant to provide a document that is vital to confirming a quality product is provided." *Id.* Buntin reminded Haren that Garver still needed material verification for the Equipment, the requested fabrication drawings,

and a repair plan that addresses all deficiencies, including an inspection of the welds and their configuration and any other potential deficiencies.  *Id.*

73. Haren emailed Buntin and Schweinfurth: "We are losing valuable time with additional requirements.  Fairfield needs to rework the welds, change the non [stainless-steel] parts, REVIEW THE SPECIFICATIONS AND COMPARE TO THE ASSEMBLED PRODUCT AND TEST RUN THE UNIT (capitalization provided for Fairfield's benefit) then resend to the site." (*Id.*, Haren message, Wed., Aug. 9, 2017 10:34 AM.)  Contractor anticipated holding the City and Fairfield jointly responsible for the delays in achieving Substantial Completion of the Project.  *Id.*

74. Schweinfurth responded to Haren's email by sending an updated Corrective Action Plan letter "stating the replacement parts with SS parts and specifics regarding the welds rework.  Please provide your approval so we may proceed."  A "Corrective Action Plan" letter dated August 9, 2017 was attached.  (Pl.'s Ex. 19, Schweinfurth message, Wed., Aug. 9, 2017 4:52 pm.)

75. Haren forwarded Fairfield's updated Corrective Action Plan to Buntin.  "I have instructed them to proceed and to also provide the requested schedule of repairs and locations."  (Pl.'s Ex. 22, Haren message, Thur., Aug. 10, 2017 4:09 PM.)

76. At Haren's request, Schweinfurth revised the updated Corrective Action Plan.  (Pl.'s Ex.20. Schweinfurth message, Thu., Aug. 10, 2017 4:27 pm.)

77. Buntin sent Haren an email with a letter attached in response Fairfield's Corrective Action Plan.  (Pl.'s Ex. 22, Buntin message, Thu. Au. 10, 2017 7:06 pm.)

78. Responding to Buntin's letter, Haren agreed that the material test report submitted by Fairfield was untraceable.  Fairfield had been asked to have the metallurgy tested in the U.S. by a verified testing company.  Haren advised Buntin that Fairfield had also been instructed to "grind out the defective welds and replace" them rather than cover them up.  Furthermore, the

screen would be removed to Ohio for repair, and detailed a schedule of repairs for the screen would be provided. Haren promised to begin the process of purchasing an alternate [Duperon] screen if Fairfield failed to confirm "they are proceeding as…instructed." (Pl.'s Ex. 24, Haren message, Fri., Aug. 11, 2017 8:36 am.)

79. Schweinfurth sent Haren a second revised, updated Corrective Action Plan "in compliance with the requested corrective actions and needs accepted by JS Haren in order for us to move forward with the rework." A "Corrective Action Plan" letter dated August 9, 2017 was attached. (Pl.'s Ex. 21, Schweinfurth message, Fri., Aug. 11, 2017 9:26 am.)

80. Haren rejected Fairfield's proposal, "It was revised yesterday and now, today, it was revised via email…Make corrections…state links will be tested in the US and that defective welds will be removed and replaced. Add a statement 'The screen will be fabricated in accordance with the screen specifications' and I will sign." Haren advised Schweinfurth that he was in the process of reviewing the Duperon proposal. (Pl.'s Ex. 21, Haren message, Fri., Aug. 11, 2017 9:55 am.)

81. Around this same time, Buntin emailed Haren with instructions to proceed as outlined in the attached letter from Garver. (Pl.'s Ex. 24, Buntin message, Fri., Aug. 11, 2017 9:53 AM.)

82. When no response was received from Haren, Buntin messaged again and asked for confirmation of receipt of the letter from Garver. (*Id*. at 11:00 AM.)

83. Haren confirmed receipt of the letter and advised it had been forwarded to Fairfield. (*Id.*, Haren message, Fri., Aug. 11, 2017 10:33 AM.)

84. Haren messaged Schweinfurth and attached a copy of the letter from Garver. "I again instruct Fairfield to proceed as I have instructed. I demand confirmation….prior to 5 PM EST today. Thereafter, this will be a closed subject and I will proceed to re purchase the screen in order to mitigate damages." (Pl.'s Ex. 27, Haren message, Fri., Aug. 11, 2017 11:00 AM.)

85. Later in the day after hearing nothing more, Buntin emailed again: "Sky, has Fairfield provided confirmation they are proceeding?" (Pl.'s Ex. 24, Buntin message, Fri., Aug. 11, 2017 4:39 PM.)

86. Upon receiving Buntin's email, Sky Haren emailed Schweinfurth and included the text from the body of a letter to Contractor's attorney setting out the problems Contractor had encountered on the Project with respect to Fairfield and the mechanical bar screen, and outlining claims for actual and liquidated damages caused by Fairfield's failure to make the requested repairs. The wording made clear Contractor intended to demand the return of its funds alleging Fairfield fraudulently shipped an inferior product and removed it from the site. (Pl.'s Ex. 27, Haren message, Fri., Aug. 11, 2017 4:44 PM.)

87. Upon receipt of the email from Haren, Fairfield President Madu Murarka got involved in the discussions. In a message to Haren, Murarka explained that to cut the welds and try to re-weld would be "worse in terms of strength and look and not to mention it will warp." In order to keep the City happy, Murarka proposed mitigation in the form of an extended warranty. If the City was unwilling to accept the extended warranty, then all Fairfield could do is "a continuous weld on the current stitch weld[s]" so it would meet the specifications. (Pl.'s Ex. 25, Murarka message, Mon., Aug. 14, 2017 10:12 AM.)

88. At trial, Murarka testified that Fairfield used Solid Works software to design the Equipment, and the predicted life projection of the Equipment was 10-15 years. The screen fabrication shop is independent from Fairfield. The shop has so much experience building this type of Equipment that they work off the submittal drawings only and do not prepare additional fabrication drawings prior to manufacture. Although the design specifications contained in the Bidding Documents called for continuous welds, Fairfield has always used skip welds because skip welds are the industry standard. Fairfield reinforces the Equipment in other ways.

Murarka was confident the Equipment was acceptable for its intended use and stated the issues raised by the City in no way affected the integrity of the Equipment. Fairfield has a long and successful history of manufacturing similar Equipment for other Projects. Murarka insisted that, if the Equipment for the Stokes Project had been installed and submerged upon delivery in October 2016, the mechanical bar screen would be operating optimally today.

89. Madu Murarka is a credible and believable witness, and the Court accepts his testimony as truthful and accurate.

90. Responding the Murarka's email message, Haren wrote, "Fairfield needs to agree to everything contained in my last emails and provide a schedule of repairs. Include testing the unit before return based upon your comments concerning warping below." Haren explained that he had an upcoming conference call with the City and Garver and he "fully expect[ed] to be ordered to proceed with another vendor." (*Id.*, Haren message, Mon., Aug. 14, 2017 9:47 AM.)

91. Murarka replied that the warpage would be inevitable due to stress. He asked Haren to convey the extra warranty offer while on the conference call with the City and Garver. (*Id.*, Murarka message, Mon. Aug. 14, 2017 11:23 AM.)

92. Fairfield's warranty proposal was rejected, and Haren was instructed to proceed with negotiations to purchase the Equipment from another manufacturer. "There is no interest in an extended warranty on a product that cannot be verified as acceptable," Haren wrote in a post-conference call email to Murarka. (*Id.*, Haren message, Mon., Aug. 14, 2017 12:00 PM.) Haren also reiterated the requirement for Fairfield to submit fabrication drawings showing weld types and sizes; verification of stainless-steel parts by a U.S. based testing lab; and a time schedule of repairs to be completed within 10 calendar days. *Id.*

93. Murarka responded saying Fairfield was regrouping to see what could be done about the welds, and he asked whether Garver would accept a simple magnet test or a chemical test to verify the stainless-steel parts. (Pl.'s Ex. 26, Murarka message, Mon., Aug. 14, 2017 2:09 PM.)

94. A few minutes later, Murarka sent a second message to Haren, "Looks like we may have a solution to the weld problem…. The time required will be 4-5 weeks. (Pl.'s Ex. 25, Murarka message, Mon., Aug. 14, 2017 2:26 PM.)

95. Haren responded, "If you are serious about continuing, I need TODAY the fabrication drawings. I must have the agreement to perform the repairs outlined below and a schedule by NOON TOMORROW." (Emphasis included.) (Pl.'s Ex. 26, Haren message, Mon., Aug. 14, 2017 1:49 PM.) Haren advised that stainless steel testing with a magnet would not be acceptable, but chemical testing would be acceptable provided it was "conducted by a person that could provide a certified report and has testing credentials." *Id.* Haren asked Fairfield to show good faith by sending the fabrication drawings that same day. *Id.*

96. A short time later, Haren sent a second email to Murarka requesting specific details, dates and times for completion of the corrective work, including: Equipment pick-up and delivery dates; the address of the repair facility; the names of persons performing the repair work; specific items of work that would be performed and the dates thereof; the dates of the metallurgy testing and report; the date and specifics of Equipment testing; and return shipping to Hot Springs. (Pl.'s Ex. 27, Haren message, Mon., Aug. 14, 2017 2:09 PM.) Haren pointed out to Murarka that taking 4 to 5 weeks to repair the welds could result in the accrual of an additional estimated $100,000 in damages.

97. Murarka responded to Haren's demands for a specific and detailed schedule, "I do not ask you how you run your business…I do not feel it is your business to micromanage us. I want a memo from you that there will be no debits to our retainage or this deal is off." Murarka also

demanded to know who would be coming to the factory to inspect the repairs made to the Equipment, including the welds. Would it be the City, Garver or Contractor? Murarka asked Contractor "to make up [its] mind." *Id*., Murarka message, Mon., Aug. 14, 2017 3:32 PM

98. A short time later, Murarka sent a second response email to Haren, and he admitted there were no fabrication drawings. Murarka asked Haren to "back off" on his threats. Murarka demanded to know whether Contractor would come to inspect the repairs before the Equipment was shipped back to the Project site for installation. "This time when the machine goes from here I do not want to hear any other issues from the field." (Pl.'s 26, Murarka message, Mon., Aug. 14, 2017 3:34 PM.)

99. Fairfield sent an email to Haren containing a drawing of the side frame of the Equipment and explained the drawing was representative of the "typical detail drawings … we submit" for fabrication." (Pl.'s Ex. 28, Vk Murarka message, Mon., Aug. 14, 2017 4:31 PM.)

100. Haren asked for and received permission to share the fabrication drawing with the City and Garver. (Pl.'s Ex. 28, Haren message, Mon., Aug. 14, 2017 5:09 PM; Vk Murarka message, Mon., Aug. 14, 2017 5:13 PM.)

101. Haren submitted the drawing to Merriman and asked for approval. (Pl.'s Ex. 29, Mon., Aug. 14, 2017 4:26 PM.)

102. Garver confirmed that Haren had until 5:00 p.m. CDT, August 15, 2017 to provide a plan outlining how an acceptable bar screen would be provided. "This plan should include information regarding a path forward with either Fairfield Service Company, or another approved equal vendor, and your anticipated schedule for deliver of an acceptable bar screen." (Pl.'s Ex. 30, Martin message, Aug. 14, 2017 5:22 PM.)

103.    Merriman replied, "Realizing I am viewing this on my phone without glasses, this does not appear to resemble any portion of the frame."  (Pl.'s 29, Merriman message, Mon., Aug. 14, 2017 6:00 PM.)

104.    The next morning after taking a better look at the drawing, Merriman sent a message to Haren:

Viewing it as I should, glasses in hand, I do see some differences between this and the end product.  This drawing depicts ¼" fillet welds both sides, that is not what we have, as we all know…Where did the stitch weld process come from?  Why were they trying to provide justification for a weld configuration that did not appear on their fabrication drawing?"

(Pl.'s Ex. 31, Merriman message, Tue, Aug. 15, 2017 7:28 AM.)

105.    Haren forwarded Merriman's email to Fairfield and asked whether Fairfield was working to repair the screen.  "If so, please send the answers to the schedule indicating dates and names of QC people.  Madu, I believe, felt like I was prying but I am trying to show the owner cooperation which is really important now if we are to gain their good will."  (Pl.'s Ex. 31, Haren message, Tue., Aug. 15, 2017 9:46 AM.)

106.    Merriman sent a second, follow-up email confirming that he and T.J. Bruck had gone out to the Project site, inspected the bar screen, and confirmed the welds did not conform to the fabrication design drawing Fairfield provided.  Merriman noted multiple welding processes were used, but no certifications had been provided for the processes.  Also, the welds appeared to be "hastily" done and still had slag on them.  "Once again this brings into question the welder, certification of such and the overall quality assurance/quality control aspect of this equipment."  (Pl.'s Ex. 32, Merriman message, Tue., Aug. 15, 2017 10:11 AM.)

107.    During the inspection, T.J.Bruck noticed the screen to compactor chute component of the Equipment also showed signs of the same oxidation, rust or corrosion as the screen arm and

forwarded pictures to Merriman and Buntin. (Pl.'s Ex. 33, Bruck message, Tue., Aug. 15, 2017 10:39 AM.)

108. Shortly thereafter, Haren declared Fairfield in default of Purchase Order 4502 and revoked acceptance of the Equipment. (Pl.s Ex. 34, Haren message, Tue., Aug. 15, 2017 1:18 PM.) "Fairfield is demanded to return the $155,700 paid for equipment … within 5 calendar days. Fairfield is to remove the screening compactor from the site as this equipment is also rejected." *Id.*

109. Next Haren notified Garver that it had declared Fairfield in default and issued a purchase order to Duperon for the Equipment. "It is the intent of this letter to satisfy [Garver's] letter of August 14, 2017 requesting a plan by 5:00 PM this evening." (Pl.'s Ex. 35, Haren message, Tue., Aug. 15, 2017 2:03 PM.)

110. Fairfield arranged for the pick-up of the compactor from the Project site. (Pl.'s Ex. 37.)

111. David Poston is a welding expert who inspected the Equipment at Haren's request. On August 23, 2017, Poston noted welding discrepancies on the Compactor component, including welds that would be considered failing due to presence of pipping, porosity, and lack of fusion. (Pl.'s Ex. 38, Plate 1.)

112. With regard to the Mechanical Bar Screen, Poston noted that all "stiffener plates…were detailed to have ¼" convex fillet weld and be welded the full length of the stiffener plate," but the plates were observed to have been "stitch welded with visible tack welds left in place." In addition, many of the welds were observed to be undersized, and numerous fillet welds were cracked or exhibited lack of fusion on one side of the weld. (Pl.'s Ex. 38, Plate 2.)

113. Poston recommended a complete rework of the shop applied welds. *Id.*

114. Contractor ordered replacement Equipment from Duperon at a total cost of $180,000. (Pl.'s Ex. 40, Material Order, Sept. 8, 2017.)

115.   Sky Haren testified at trial that Contractor was not assessed liquidated damages by the City. However, during negotiations for final payment, the City's potential claim for liquidated damages was cause for Contractor to settle for payment of an amount less than the full amount claimed.

116.   Contractor claims damages from Fairfield in the total amount of $206,858, including the costs of replacement Equipment, manpower and staffing, and storage fees.  (Pl.s Ex. 41, Costs of Replacement spreadsheet.)

## II.   CONCLUSIONS OF LAW

A.  Breach of Contract

1.  To recover for breach of contract under Arkansas law, a plaintiff must prove: (1) the existence of a valid contract; (2) breach of the contract; and (3) damages that flow from the breach.  *United States v. Basin Elec. Power Co-op.*, 248 F.3d 781, 810 (8th Cir. 2001).

2.  A valid contract, Material Order No. 4502, existed between Contractor and Fairfield Service Company of Indiana, LLC.  The contract terms provided that the Equipment would be manufactured in accordance with the Bidding Documents.

3.  Fairfield breached the contract when the Equipment was not manufactured in strict accordance with the plans and specifications set out in the Bidding Documents or the approved submittal data.

4.  Contractor suffered damages flowing from the breach.

B.  Breach of Warranty

1.  In Arkansas, a buyer who "has accepted goods and given notification (§ 4-2-607(3))… may recover as damages for any non-conformity of tender the loss resulting in the ordinary

course of events from the seller's breach as determined in any manner which is reasonable." A.C.A. § 4-2-714 (1).

2. "Non-conformity" includes breaches of warranty and any failure of the seller to perform according to his obligations under the contract. *Ford Motor Credit Co. v. Harper*, 671 F.2d 1117, 1124 (8th Cir. 1982).

3. Fairfield failed to perform according to its obligations when the tendered Equipment did not conform to the technical specifications imposed by the contract, Material Order, and Bidding Documents.

4. The buyer must within a reasonable time after he discovers or should have discovered any breach notify the seller of breach or be barred from any remedy. A.C.A. § 4-2-607(3)(a).

5. The mere acceptance of goods does not bar a claim for damages due to non-conformity. *Hanna Lumber Co. v. Neff*, 265 Ark. 462, 579, S.W.2d 95 (1979).

6. Plaintiff reasonably discovered the "non-conformity" of the Equipment on July 12, 2017 after Hickok performed the onsite inspection of the Equipment and noted several items that did not comply with the contract's technical specifications or Fairfield's submittals. (Pl.'s Ex. 9, Hickok message, Wed., July 12, 2017 2:04 PM.)

7. Notice must be provided before bringing action for breach of warranty. *Hartness v. Nuckles*, 2015 Ark. 444, 475 S.W.3d 558 (2015) (purpose of notice requirement is to allow seller opportunity to reduce his damages by curing the defect).

8. Contractor provided notice of its breach of warranty claim to Fairfield in the email Sky Haren sent to Schweinfurth on July 27, 2019. (Pl.s Ex. 11, Haren message, Thu., July 27, 2017 10:55 AM.)

9. Fairfield failed to timely cure the non-conformities.

10. Contractor is entitled to recover as damages the loss resulting in the ordinary course of events from Fairfield's breach.

C. Revocation of Acceptance

1. Revocation of acceptance is justifiable when the buyer establishes (1) a nonconformity which substantially impairs the value of the goods to the buyer; (2) acceptance (a) with discovery of the defect on the reasonable assumption that the nonconformity would be cured or (b) without discovery reasonably induced by the difficulty of the discovery or by seller's assurances; (3) revocation within a reasonable time after the nonconformity was discovered or should have been discovered; and (4) revocation before a substantial change occurs in the condition of the goods not caused by their own defects. A.C.A. § 4-2-608; see also *Ford Motor Credit Co. v. Harper*, 671 F.2d 1117, 1122 (8th Cir. 1982) (citation omitted).

2. A buyer who revokes has the same rights and duties with regard to the goods involved as if he had rejected them. *Id.*

3. The Equipment nonconformities substantially impaired the value of the Equipment to Contractor, because the City and Garver consistently refused to allow the use of non-conforming items in the Project.

4. Contractor accepted delivery of the Equipment on October 28, 2016. It was reasonable for Contractor to perform a cursory inspection upon receipt. After the damaged door was repaired, it was reasonable for Contractor to assume the Equipment otherwise conformed to the strict technical specifications imposed by the Bidding Documents, the Material Order, and Fairfield's submittal data. This assumption was further bolstered by the difficulty of the discovery of the metallurgy and welding irregularities.

5. Contractor discovered the non-conformities on July 12, 2019 when Hickok reported the findings of his onsite inspection of the Equipment.

6. Contractor's revocation on August 15, 2019 came within a reasonable time after the nonconformities were discovered.

7. The revocation was made before a substantial change in the condition of the Equipment not caused by its own defects.

D. Damages

1. The measure of damages for breach of contract is the amount Contractor incurred to complete the work less the amount it would have paid Fairfield if no breach had occurred. *MDH Builders, Inc. v. Nabholz Const. Corp.*, 70 Ark.App. 284, 17 S.W.3d 97 (Ark. App. 2000).

2. In this case, Contractor paid Duperon $180,000 for replacement Equipment to complete the Project, and it would have paid Fairfield $173,000 for the Equipment if no breach had occurred.

3. The measure of damages for breach of warranty is the difference at the time and place of acceptance between the value of the goods accepted and the value they would have had if they had been as warranted, unless special circumstances show proximate damages of a different amount. A.C.A. § 4-2-714 (2).

4. The value of the Equipment at the time it was accepted was zero because it did not conform to the very precise and detailed requirements contained in the Bidding Documents, the Material Order, and Fairfield's submittal data. Contractor was within its rights refusing to accept Equipment that did not strictly conform to the specifications required by the contract. If the Equipment had been as warranted, its value would have been $173,000.

5. In a proper case for breach of warranty, incidental and consequential damages may also be recovered. A.C.A. § 4-2-714 (3).

6. "Incidental damages resulting from the seller's breach include expenses reasonably incurred in inspection, receipt, transportation and care and custody of goods rightfully rejected, any commercially reasonable charges, expenses or commissions in connection with effecting cover and any other reasonable expense incident to the delay or other breach." A.C.A. § 4-2-715. "Incidental damages resulting from breach of warranty are costs of cover and any other reasonable expense incident to the breach." *Kohlenberger, Inc. v. Tyson's Foods, Inc.*, 256 Ark. 584, 590-91, 510 S.W.2d 555, 560 (1974).

7. Consequential damages resulting from the seller's breach include any loss resulting from general or particular requirements and needs of which the seller at the time of contracting had reason to know and which could not reasonably be prevented by cover or otherwise. *Id.*

8. The proper measure of damages for Fairfield's breach is $173,000.

9. The proper measure of incidental damages caused by Fairfield's breach is $7,000.

10. Consequential damages are not appropriate in this case, because Contractor did not incur liquidated or special damages to the City for failing to meet the Project timeline.

E. Attorney's Fees

1. Arkansas "follows the American rule, which requires every litigant to bear his or her attorney's fees absent statutory authority or a contractual agreement between the parties." *Stokes v. Stokes*, 2016 Ark. 182, 491 S.W.3d 113 (2016).

2. Arkansas Code Annotated section 16-22-308 permits an award of fees to a prevailing party in certain civil actions:

> In any civil action to recover on [a] …contract relating to the purchase or sale of goods,…or breach of contract, unless otherwise provided by law or the contract which is the subject matter of the action, the prevailing party may be allowed a reasonable attorney's fee to be assessed by the court and collected as costs.

3. In consideration of the foregoing findings of fact and conclusions of law, the Court declines to award attorney's fees to either party. Each party shall bear its own fees and costs.

## **ORDER**

Wherefore, the Court makes its ORDER as follows:

For the reasons stated herein, Plaintiff J.S. Haren Company should have and recover damages in the total amount of $180,000 against Defendant Fairfield Service Company of Indiana, LLC. Each party shall bear its own costs and attorney's fees. A separate judgment will be entered.

**IT IS SO ORDERED**, this 12th day of September 2019.

/s/ *Robert T. Dawson*
**ROBERT T. DAWSON**
**SENIOR U. S. DISTRICT JUDGE**